Filed 1/3/24  P. v. Salmeron CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EVELYN D. SALMERON,<br><br>    Defendant and Appellant. | G061607<br><br>(Super. Ct. No. 04WF0154)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Michael Cassidy, Judge.  Affirmed.

Lisa A. Kopelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, Paige B. Hazard and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Our Supreme Court has held that "when a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with '"objective evidence."'" (*People v. Vivar* (2021) 11 Cal.5th 510, 530 (*Vivar*).)

In 2004, Evelyn D. Salmeron pleaded guilty to three charges of felony child abuse committed against her 11-year-old daughter and eight-year-old son. Salmeron also admitted causing great bodily injury to her daughter by burning her with an iron.

In 2022, Salmeron filed a motion to vacate her prior convictions on the basis of a prejudicial error by counsel damaging her ability to meaningfully understand the immigration consequences of her pleas. (See Pen. Code, § 1473.7, subd. (a)(1).)[1] After Salmeron testified at an evidentiary hearing, the trial court denied the motion.

We find a lack of objective evidence to corroborate the assertions in Salmeron's section 1473.7 motion. Thus, we affirm the order of the trial court.

I

FACTS AND PROCEDURAL BACKGROUND

On January 21, 2004, the Orange County District Attorney filed a felony complaint charging Salmeron (born May 10, 1973), with one count of child abuse likely to cause great bodily harm or death, and two counts of inflicting physical punishment on a child resulting in a traumatic condition. (§§ 273a, subd. (a), 273d, subd. (a).) The complaint further alleged as to count one that Salmeron personally inflicted great bodily injury (a strike offense). (§§ 667.5, 1192.7, 12022.7, subd. (a).)

On March 18, 2004, Salmeron signed a felony plea form. The factual basis for the plea stated: "On or about & between 9-1-03 & 1-14-04 in Orange County I willfully inflicted great bodily injury on my 11 year old daughter by intentionally burning

---

[1] Further undesignated statutory references are to the Penal Code; henceforth, we shall refer to the instant motion as a section 1473.7 motion.

2

her with a hot iron.  [¶]  During that same time frame I inflicted unlawful corporal injury on my 8 year old son by repeatedly hitting him with a hanger."  The plea form indicated Salmeron's maximum possible punishment was 10 years and four months.  The disposition negotiated with the prosecution was that Salmeron would be placed on probation for four years and receive 365 days in jail time.

Salmeron initialed an advisement that stated:  "I understand that if I am not a citizen of the United States the conviction for the offense charged *will* have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."  (Italics added.)

Salmeron was represented by counsel and was assisted by a Spanish language interpreter.  Salmeron signed the following statement:  "I understand each and every one of the rights outlined above and I hereby waive and give up each of them in order to enter my plea to the above charge(s).  I am entering a plea of guilty because I am in fact guilty and for no other reason.  I declare under penalty of perjury that I have read, understood, and personally initialed each item above and discussed them with my attorney, and everything on this form is true and correct."

Counsel signed the following statement:  "I am attorney of record and I have explained each of the above rights to the defendant, and having explored the facts with him/her and studied his/her possible defenses to the charge(s), I concur in his/her decision to waive the above rights and to enter a plea of guilty."

*Section 1473.7 Motion*

On March 11, 2022, Salmeron filed a section 1473.7 motion to vacate her 2004 convictions on the basis of "prejudicial error on the part of [her] trial counsel damaging her ability to meaningfully understand or defend against the adverse immigration consequences of her guilty verdict."

In the body of the motion, Salmeron's counsel asserted:  "Ms. Salmeron

3

was deprived of effective assistance of counsel because of previous counsel's failure to investigate and advise Ms. Salmeron about the disastrous immigration consequences of her court trial and failure to defend against such consequences by attempting to negotiate a less harmful alternative plea fell below the standards of reasonable conduct for defense counsel [(*sic*)]. . . . If she had known about the immigration consequences of a plea to the Penal Code § 273a(a) violation, or understood that there were alternatives, she would not have accepted such a plea especially. Ms. Salmeron indeed would have directed counsel to continue to seek an acceptable alternative or prepare for trial."

Attached to the section 1473.7 motion was a declaration by Salmeron (now Paz), in which she averred to the following statements: "I entered the United States in 1996." "I was given a plea deal that minimized jail time and I focused on minimizing exposure to incarceration as I believed that was my main concern when weighing the risks and benefits of moving forward with my case." "My counsel did not inform me and I did not understand that immigration consequences of a plea of guilty . . . ." "I do not recall my attorney informing me or explaining to me that the conviction in this matter would make me deportable." "I do not have any close relatives or friends in the country of my birth." "Had I known, or been made aware that accepting the plea would lead to removal proceedings, I never would have accepted the plea, and would have looked into other options to stay in the United States."

Also attached to the motion were five documents.[2] In chronological order, the first document is a Notice to Appear in removal proceedings from the Department of Homeland Security (DHS), dated August 26, 2011. The notice appears to allege Salmeron was a citizen of El Salvador, she had not been admitted into the United States, and she was subject to removal based on the 2004 convictions. The second document is dated August 20, 2014, and appears to be a notice from DHS that a 2012 application by

[2] The five documents were not mentioned or explained in the body of the motion, nor was there any testimony regarding these documents in the later hearing on the motion.

Salmeron for a "U visa" had been denied.[3]  The third document is dated November 22, 2016, and appears to be a notice from DHS captioned:  "Approval Notice Section: Husband or wife of U.S. Citizen."  The fourth document is dated February 28, 2017, and appears to be a notice from DHS that a second 2017 application by Salmeron for a "U visa" had been received.  The fifth document is dated December 1, 2021, and appears to be a notice of an upcoming hearing on February 24, 2022, in the Immigration Court.

On July 15, 2022, the trial court conducted a hearing on the section 1473.7 motion.  After Salmeron testified, the trial court orally denied the motion.  (The hearing is discussed in greater detail in the discussion section of this opinion.)

## II

## DISCUSSION

Salmeron contends the trial court erred by denying her "request to vacate the plea because a preponderance of evidence shows she would have rejected the plea if she correctly understood the immigration consequences and suffers prejudice therefrom." (Boldfacing omitted.)  We disagree.

We review a trial court's ruling in a section 1473.7 motion under an independent standard of review.  (*Vivar*, *supra*, 11 Cal.5th at p. 524.)  Under this standard, "'an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.'"  (*Id*. at p. 527.)  However, independent review is not the same as de novo review; consequently, any factual findings (explicit or implied) based on the trial court's observations of witnesses are entitled to deference.  (*Ibid*.)

In this part of the discussion, we:  A) state the relevant principles of law;

---

[3] "[A] 'U visa', [is] a temporary nonimmigrant visa created by Congress to provide legal status for noncitizens who assist in the investigation of serious crimes in which they have been victimized." (*People v. Morales* (2018) 25 Cal.App.5th 502, 506.)

B) summarize the hearing on the motion; and C) analyze the law as applied to the facts.

## A. *Relevant Legal Principles*

"A person who is no longer in criminal custody may file a motion to vacate a conviction . . . for any of the following reasons: [¶] (1) The conviction . . . is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) "The court shall grant the motion to vacate the conviction . . . if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a)." (§ 1473.7, subd. (e)(1).)

"Ineffective assistance of counsel that damages a defendant's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a guilty plea . . . is the type of error that entitles the defendant to relief under section 1473.7." (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 75.) To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and the defendant was prejudiced by counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)

"What someone seeking to withdraw a plea under section 1473.7 must show is more than merely an error 'damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences' of the plea. [Citation.] The error must also be 'prejudicial.'" (*Vivar*, *supra*, 11 Cal.5th at p. 528.) Showing prejudicial error under section 1473.7, "means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration

consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Id.* at pp. 529–530.)

The facts of *Vivar* are instructional. Robert Vivar was six years old when he came to the United States from Mexico. (*Vivar*, *supra*, 11 Cal.5th at p. 516.) Forty years later, Vivar was arrested for attempting to steal 12 boxes of Sudafed from a store. (*Id*. at p. 518.) Vivar had a drug addiction problem and told the police he planned to give the Sudafed to a manufacturer in exchange for some methamphetamine. The prosecution charged Vivar with possessing methamphetamine precursors (Sudafed) with the intent to manufacture. (*Id*. at pp. 516, 518.) With the advice of counsel, Vivar pleaded guilty to the charged crime with a one-year jail term and a recommendation for a residential drug treatment program. (*Id*. at pp. 518–519.) During plea negotiations, Vivar had turned down an offer to plead guilty to a charge of burglary with a 16-month prison sentence. Vivar was not told that the narcotics crime he pleaded guilty to was an aggravated felony subjecting him to mandatory deportation, whereas the burglary charge was not. (*Ibid*.) A few days after pleading guilty, Vivar was advised of an immigration hold. Vivar promptly sent letters to the trial court stating that he would not have pleaded guilty had he known the charge would have subjected him to deportation. Vivar was deported soon after. (*Id*. at p. 520.)

In 2018, Vivar filed a section 1473.7 motion to vacate his 2002 narcotics conviction. (*Vivar*, *supra*, 11 Cal.5th at pp. 519–520.) The trial court denied the motion and the Court of Appeal affirmed, finding Vivar had shown ineffective assistance of counsel, but he "suffered no prejudice on account of counsel's error." (*Id*. at p. 523.)

In 2021, under an independent standard of review, the Supreme Court

7

granted Vivar's section 1473.7 motion. (*Vivar*, *supra*, 11 Cal.5th at p. 534.) The Court stated, "when a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with '"objective evidence."' [Citation.] That's what Vivar has done here. Time and again, the record readily conveys how Vivar would have considered his immigration status 'the most important part' of his decision to plead." (*Id.* at p. 530.) The Court noted: "Vivar had virtually no ties to Mexico," and his "[t]rial counsel's recollection and contemporaneous notes reflect that Vivar was indeed concerned about the 'consequences' of his plea. All of these constitute contemporaneous objective facts that corroborate Vivar's concern about the immigration consequences of his plea options." (*Ibid.*) The Supreme Court found that the lower courts did not "take into account the substantial contemporaneous evidence *at or near the time of Vivar's plea* corroborating his claim that he wouldn't have pleaded guilty if he'd known it would result in his deportation from his home of 40 years." (*Id.* at p. 534, italics added.)

## B. Trial Court Proceedings

Salmeron was the only witness who testified at the hearing on the section 1473.7 motion. On direct examination, Salmeron said that in 2004 she had three children, and she now has five children. Salmeron said from 1997 through 2003, her ex-husband would physically abuse her. She said her divorce was finalized in 2004, and as a consequence her husband "would beat me up." Salmeron said her husband spent a year in jail and when he got "out of jail, I had my three children at that time, so he arrived and told me if I didn't get back with him that he would turn my children against me so that I can land in jail."

Salmeron said that when she pleaded guilty her primary concern was that she "wouldn't get too much jail time." Salmeron testified she did not recall receiving a specific advisement regarding the immigration consequences of the plea from her defense

8

counsel. Salmeron said at the time of her plea she had an established family in the United States. Salmeron had a place to live, and she had stable employment. Salmeron testified that after her guilty pleas in 2004 she had no further arrests. Salmeron said she completed all the obligations of probation, including the classes that were ordered. Salmeron testified she had another legal matter earlier in 2002, and there was another failure of an immigration advisement in that case.

On cross-examination, Salmeron acknowledged she was present in court when she pleaded guilty in 2004, she was assisted by a public defender, and was assisted by a Spanish language interpreter. When asked if she had gone through the terms of her guilty plea with the attorney and through the interpreter, she responded: "All I remember is that the public defender at that time was telling me that was the best offer available. That they were offering me one year and that was the best deal and for me to accept it. [¶] So I pled guilty and I accepted it because I was afraid of getting more time. The public defender told me that if I didn't accept that year, which was the deal at the time, was that if I didn't accept that then I could get more than three years. And so I was afraid of having that happen."

When asked if she was aware she was pleading to a felony, Salmeron said, "I did not understand too well how serious the case was." When asked if she was aware the charges were for child abuse she said, "Yes. I was told of the charges." The prosecutor asked, "And when you entered into the plea, were you admitting guilt to those charges?" Salmeron said, "No. I was unfairly accused of these charges so, no, I wasn't guilty of them." After Salmeron's counsel requested and obtained a brief break and conferred with his client, the prosecutor asked Salmeron, "As you're sitting here today, are you saying that you're not guilty of the charges?" Salmeron responded, "No contest."

Salmeron said at the time she pleaded guilty she was aware she would be getting probation and a year in jail, and by pleading guilty she was admitting guilt. The prosecutor asked, "So you're saying you were told all of those things, but the only thing

9

you weren't told of were your immigration consequences?" Salmeron responded, "Yes." Salmeron said in 2002 she had pleaded guilty to similar charges, and she was placed on probation for four years with no jail time. Salmeron admitted she was on probation in the earlier case at the time she committed the offenses in the new case.[4]

After having her memory refreshed with a police report, Salmeron said she remembered speaking to police in 2004 about an injury to her daughter that looked to be an imprint from an iron. Salmeron recalled telling the officer that her daughter had burned herself. The prosecutor asked, "Were you being truthful when you admitted guilt in court?" Salmeron responded, "I said the truth."

After hearing argument from the parties, the court stated, "All right. As I said, I have to take into consideration the totality of the circumstances.

"She initialed the box indicating that if she is not a citizen, conviction of the offense will have the consequence of deportation, exclusion from admission into the United States, or denial of naturalization. She signed a document indicating that she understood that. It was interpreted for her by a Spanish interpreter.

"Showing prejudicial error in these kind of cases means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood the actual or potential immigration consequence.

"The defendant's main priority in this case, from the documents and even from the declaration, is to avoid jail time. And she expressed no concerns regarding the fact that she would have immigration consequences at the time.

"So I find no prejudicial error. The motion is denied."

C. *Application and Analysis*

Under an independent standard of review, we analyze whether  Salmeron

---

[4] This appears to have been misdemeanor probation for misdemeanor child abuse.

has proven by a preponderance of the evidence that:  1) she did not meaningfully understand the immigration consequences of her guilty pleas at the time she pleaded guilty; and 2) she would have rejected the plea offer had she understood those immigration consequences (prejudicial error).

### 1. Understanding of Immigration Consequences

Salmeron initialed next to an immigration advisement on the felony plea form.  Salmeron was advised that if she was not a United States citizen, her convictions "*will* have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."  (Italics added.)  This explicit written advisement of mandatory immigration consequences tends to show Salmeron was made aware of the immigration consequences of her guilty pleas.  (See *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 663 ["Appellant's argument that he was not aware of the mandatory nature of the deportation flies in the face of the mandatory language used to describe the likelihood of deportation"].)

The immigration advisement in this case is different from other less definitive advisements on plea forms reviewed in other published opinions.  For instance, in *Vivar*, the defendant signed a plea form stating:  "'If I am not a citizen of the United States, I understand that this conviction *may* have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.'"  (*Vivar, supra,* 11 Cal.5th at p. 519, italics added.)

We agree that a written immigration advisement with mandatory language is "not a categorical bar to relief."  (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 906.)  However, we find the record lacking in objective evidence that tends to corroborate Salmeron's self-serving testimony that she did not understand the explicit immigration advisement on the plea form.  (See *People v. Diaz* (2022) 76 Cal.App.5th 102, 113 [a movant's self-serving statement in a section 1473.7 motion is generally insufficient and it

11

must be corroborated by objective evidence].)

Salmeron's declaration in the section 1473.7 motion was also somewhat inconsistent. She stated: "My counsel *did not inform me* and I did not understand that immigration consequences of a plea of guilty to the charges would be significant and could potentially jeopardize my status in the United States." (Italics added.) However, she also stated: "I *do not recall* my attorney informing me or explaining to me that the conviction in this matter would make me deportable." (Italics added.)

In the hearing, Salmeron was asked: "Did you go through the terms of your guilty plea with your attorney and through an interpreter?" She responded, "*All I remember* is that the public defender at that time was telling me that was the best offer available." (Italics added.) On cross-examination Salmeron admitted at the time of the guilty pleas she was made aware of the charges, she was made aware of the sentence she would be getting, and she was made aware that by pleading guilty she was admitting guilt. And when the prosecutor asked, "So you're saying you were told of all those things, but the only thing you weren't told of were your immigration consequences?" Salmeron responded, "Yes."

At the conclusion of the hearing, the trial court reiterated that Salmeron had been assisted by an interpreter and that she had initialed the immigration advisement on the plea form that advised her that her guilty pleas "*will* have the consequence of deportation, exclusion from admission into the United States, or denial of naturalization." (Italics added.) Thus, although the trial court did not make any explicit factual findings when denying the motion, it appears the court implicitly found Salmeron not to be a credible witness. (See *Vivar*, *supra*, 11 Cal.5th at pp. 527–528 ["In section 1473.7 proceedings, appellate courts should . . . give particular deference to factual findings based on the trial court's personal observations of witnesses"].)

In sum, based on our independent review of the record, and considering the totality of the circumstances, we hold Salmeron has not shown by a preponderance of the

12

evidence that she did not meaningfully understand the immigration consequences of her guilty pleas at the time she pleaded guilty.

Salmeron argues in her reply brief: "In this case, appellant's position is not uncorroborated. Her efforts to obtain legal status are evidence of her state of mind at the time of her plea. She applied for a U Visa due to having been a victim of domestic violence. [Citation.] Subsequently, she applied for and was approved for a status change due to having married an American citizen."

However, there was no testimony by Salmeron—or anyone else, such as an immigration attorney—regarding the significance of the five immigration documents that were submitted as attachments to the section 1473.7 motion. Further, our review of the documents indicates that the notice of possible deportation occurred in 2011, and the four other immigration documents were dated thereafter. In short, we fail to see how these documents have any bearing on the question of whether or not Salmeron understood the immigration consequences of her guilty pleas in March 2004.

Salmeron also appears to be arguing that because she pleaded guilty in 2002 to misdemeanor child abuse charges and suffered no immigration consequences as a result, she reasonably had that same expectation when she pleaded guilty in 2004 to felony child abuse charges. But again, the record is completely lacking in any details concerning the 2002 guilty plea. For example, we do not know what the written immigration advisement specifically stated as a part of Salmeron's 2002 guilty plea, and there is no evidence as to what Salmeron was told by her attorney in 2002. Thus, Salmeron's 2002 misdemeanor guilty plea does not alter our analysis.

### 2. *Rejection of Plea Offer* (*Prejudice*)

As noted, a prejudicial error under section 1473.7, "means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts

assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, *supra*, 11 Cal.5th at pp. 529–530.)

Here, at the time Salmeron filed her section 1473.7 motion in 2022, Salmeron stated: "I do not have any close relatives or friends in the country of my birth." However, at the time of her guilty pleas in 2004, Salmeron was 30 years old and had apparently lived in the United States for about eight years. There is no evidence in the record stating what her ties were to the country of her birth at the time of her guilty pleas in 2004. (Compare *Vivar, supra*, 11 Cal.5th at p. 530 [the record in that case showed Vivar was brought to the United States at six years of age, he had lived in the United States for about 40 years, and he "had virtually no ties to Mexico" at the time he pleaded guilty to a felony narcotics charge].)

There is also no evidence in the record that Salmeron placed importance on avoiding deportation at the time of her 2004 guilty pleas. As the trial court stated when it denied the section 1473.7 motion: "The defendant's main priority in this case, from the documents and even from the declaration, is to avoid jail time. And she expressed no concerns regarding the fact that she would have immigration consequences at the time." (Compare *Vivar*, *supra*, 11 Cal.5th at p. 530 [the attorney's notes showed Vivar had sought to seek a plea deal that would avoid the possibility of deportation].)

At the time Salmeron entered her guilty pleas, she was charged with one count of child abuse likely to cause great bodily harm or death, and two counts of inflicting physical punishment on a child resulting in a traumatic condition. (§§ 273a, subd. (a), 273d, subd. (a).) The felony complaint further alleged as to count one that Salmeron personally inflicted great bodily injury (a strike offense). (§§ 667.5, 1192.7,

14

12022.7, subd. (a).) Both parties appear to agree that a charge of inflicting physical punishment on a child causing a traumatic condition is a crime that is categorically deportable, regardless of the sentence imposed. (See *Moncrieffe v. Holder* (2013) 569 U.S. 184, 187 ["if a noncitizen has been convicted of one of a narrower set of crimes classified as 'aggravated felonies,' then he is . . . deportable"].)

Also, Salmeron was facing a maximum penalty of 10 years and eight months in prison, and she was apparently on probation for misdemeanor child abuse charges at the time she committed the new offenses. A probationary sentence with one year of jail time appears to have been a very favorable disposition given these aggravating circumstances. Moreover, there is no objective evidence in the record (such as a declaration or the testimony of an immigration attorney) that would tend to support a reasonable inference that Salmeron "had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, *supra*, 11 Cal.5th at pp. 529–530.)

In sum, even if we were to assume Salmeron did not understand the immigration consequences of her 2004 guilty pleas, based on our independent review of the entire record, we hold Salmeron has not proven by a preponderance of the evidence that she would have rejected the prosecution's 2004 plea offer.

Salmeron argues that *People v. Espinoza* (2023) 14 Cal.5th 311 (*Espinoza*), compels a different result. We disagree.

Juventino Espinoza was 13 years old when he moved from Mexico to the United States. (*Espinoza*, *supra*, 14 Cal.5th at p. 317.) By the time of his arrest over forty years later for suspected methamphetamine manufacturing, Espinoza had become a lawful permanent resident, was married with six children, and had no prior criminal history. (*Id*. at pp. 317–318.) In 2003, Espinoza pleaded no contest to conspiracy, child abuse likely to cause great bodily harm or death (273a, subd. (a)), controlling property to manufacture narcotics, and possession of a controlled substance. (*Espinoza*, at p. 318.) In 2015, when returning to the United States from an overseas trip, immigration

15

authorities seized his permanent resident card, and he first became aware of the immigration consequences of his 2003 no contest pleas. (*Ibid.*) Espinoza later filed a section 1473.7 motion supported "with evidence regarding his biographical history and ties to the United States; his lack of a criminal record; his community involvement following his conviction; and a declaration from an immigration law expert explaining that he could have pleaded to alternative, immigration-safe dispositions." (*Espinoza*, at p. 321.) The trial court denied the section 1473.7 motion, but the Supreme Court disagreed, finding Espinoza had, in fact, established a prejudicial error. (*Espinoza*, at pp. 319, 321.)

In addition to Espinoza's significant ties to the United States at the time of his guilty pleas, the Supreme Court noted: "Espinoza had no prior criminal history at the time of his plea. This fact is relevant because a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences." (*Espinoza*, *supra*, 14 Cal.5th at p. 324.) The Court also noted: "Espinoza presented evidence from an immigration attorney that there were alternatives the prosecution could have offered that would not have resulted in mandatory deportation. . . . The immigration attorney's declaration identified alternative offenses without deportation consequences to which Espinoza might have been able to plead." (*Ibid.*)

"Having considered the totality of the circumstances here, we conclude that Espinoza has shown a reasonable probability that he would have rejected the plea and either gone to trial or sought a different, immigration-safe bargain if he had understood the consequences of the plea. Espinoza's deep and longstanding ties to the United States, along with those to his family and community, support the conclusion that immigration concerns would have been paramount to him at the time of his plea. [Citation.] In addition, Espinoza's lack of criminal history at the time of his plea and the immigration attorney's declaration identifying alternative immigration-safe dispositions suggest that

16

he had reason to expect or hope for a different plea agreement without immigration consequences. [Citation.] [¶] We also find it significant that the Attorney General agrees Espinoza is entitled to relief." (*Espinoza*, *supra*, 14 Cal.5th at p. 325.)

Unlike *Espinoza*, the record in this case does not corroborate Salmeron's assertion that she would have rejected the plea offer in 2004 had she understood the immigration consequences. Salmeron was 30 years old and had been in the United States for about eight years at the time of her guilty pleas; whereas Espinoza was about 53 years old and had been in the United States for over 40 years at the time of his guilty pleas. (See *Espinoza*, *supra*, 14 Cal.5th at p. 317.) Salmeron had a prior criminal record at the time of her guilty pleas; whereas Espinoza had no criminal record at the time of his guilty pleas. (See *Id*. at p. 318.) Indeed, Salmeron was on probation for the same type of child abuse charges when she committed the new offenses. Salmeron presented no evidence of a possible reasonable alternative plea arrangement that could have been offered by the prosecution resulting in no immigration consequences; whereas Espinoza presented expert testimony that there was such a possibility in his case. (See *Id*. at p. 324.) And finally, although this fact is certainly not dispositive, unlike *Espinoza*, the Attorney General does not concede Salmeron is entitled to relief. (See *Id*. at pp. 325–326.)

To reiterate and conclude, we hold Salmeron has failed to show by a preponderance of the evidence that she did not understand the immigration consequences of her 2004 guilty pleas. And in any event, even if we were to assume that Salmeron did make such a showing, Salmeron has not shown by a preponderance of the evidence a reasonable probability that she would have rejected the prosecution's 2004 plea offer.

17

III

DISPOSITION

The order of the trial court, which denied Salmeron's section 1473.7 motion to vacate her 2004 felony convictions, is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


GOODING, J.